Sherman NAPIER et al., Plaintiffs,

v.

SYSTEM FEDERATION NO. 91, RAILWAY EMPLOYES' DEPARTMENT, AMERICAN FEDERATION OF LABOR et al., Defendants.

Civ. No. 2300.

United States District Court,
W. D. Kentucky, at Louisville.

Jan. 22, 1955.

William Friedlander, Louisville, Ky., for plaintiffs.

Richard R. Lyman, Toledo, Ohio, Robert E. Hogan, Louisville, Ky., for all defendants other than Louisville & N. R. Co.

C. S. Landrum, Lexington, Ky., for Louisville & N. R. Co.

SHELBOURNE, Chief Judge.

The facts in this case are not in dispute. The plaintiffs seek relief from

certain provisions of two collective bargaining agreements executed by and between the Louisville and Nashville Railroad and System Federation No. 91, Railway Employee's Department, American Federation of Labor, herein referred to as the A. F. of L. The provisions in issue relate to seniority rights of a group of employees of the L & N Railway, classified as Laborers. In effect, the plaintiffs allege that they have been laid off by the defendant carrier through recent reductions in work force by the operative effects of the seniority provisions in issue, while other employees were retained because of a discriminatory and hostile intent of the defendants embodied in the questioned provisions, which were negotiated under circumstances denying plaintiffs due process of law.

No effort has been made to show a pattern of discrimination by the defendants other than that allegedly displayed in the agreements themselves.

Counsel for both plaintiffs and defendants agree that questions of law are at issue and that a proper determination of the law applicable to the undisputed facts in the case would properly decide the case.

The parties have by written stipulation agreed upon the facts and the Court hereby adopts such stipulation as its findings.

1. Twelve plaintiffs were dropped from laborers' seniority rosters by the railroad and thus lost their laborers' seniority rights because, while they were laid off from helper positions in one district, and while working as laborers in another district, the railroad notified each of the twelve plaintiffs and other laid-off helpers of a restoration of forces in the district where laid off, whereupon each of said plaintiffs returned to his former position as helper in a district other than the district in which he was working as laborer and remained as helper in the other district for a period of more than 30 days. The employment and seniority of those twelve employes are as follows:

(a) Sherman Napier commenced working as laborer at Hazard, Ky., November 20, 1926; was promoted to Boilermaker Helper at Hazard on March 8, 1929; transferred to South Louisville as Boilermaker Helper September 16, 1935; cut off as Boilermaker Helper South Louisville and transferred to Hazard as laborer June 16, 1949; was working as laborer at Hazard on July 22, 1949, when recalled to Shop 3, District 8, South Louisville Shops as Boilermaker Helper, transferred to that shop and remained there as such helper for more than 30 days. Prior to his transfer to South Louisville on July 22, 1949, he had laborer's seniority at Hazard from November 20, 1926; Boilermaker Helper seniority at Hazard from March 8, 1929, and Boilermaker Helper seniority District 8, South Louisville from September 16, 1935. When he remained as Boilermaker Helper at South Louisville more than 30 days after his transfer there on July 22, 1949, he was dropped from the laborer's seniority roster at Hazard and thus lost all laborer's seniority at Hazard. His claim is that he should have retained his laborer's seniority at Hazard from November 20, 1926.

(b) William D. Hillson commenced working as laborer in the South Louisville Shops November 21, 1925; was cut off in force reduction on April 20, 1932; was again employed as laborer South Louisville Shops, September 26, 1935; promoted to Carman Helper South Louisville on October 4, 1935; transferred to Boilermaker Helper, Shop 3, South Louisville, on October 29, 1935; was working as laborer in Shop No. 14, District 5, South Louisville on October 1, 1938, and on that day established laborer's seniority in District 5, South Louisville, dating from his hire-in date of August 24, 1925; was cut off as Boilermaker Helper, Shop 3, and transferred to District 5 as laborer on September 26, 1949; was working as labor-

er in District 5, South Louisville Shops, on November 28, 1949, when recalled to Shop 3, District 8, as Boilermaker Helper and remained in Shop 3, District 8 as such helper for more than 30 days. Prior to his transfer to Shop 3, District 8, on November 28, 1949, he had laborer's seniority in District 5 from August 24, 1925, and Boilermaker Helper seniority, South Louisville, from October 29, 1935. When he remained as Boilermaker Helper, Shop 3, District 8, more than 30 days after his transfer there on November 28, 1949, he was dropped from laborers' seniority roster for District 5 and thus lost his laborer's seniority in District 5. His claim is that he should have laborer's seniority South Louisville Shops from August 24, 1925.

(c) A. B. Johnson commenced working as laborer, South Louisville Shops, October 30, 1935; was promoted to Boilermaker Helper, South Louisville Shops, October 6, 1936; was working as laborer in Shop No. 14, District 5, on October 1, 1938, and on that day established laborer's seniority in District 5; South Louisville from October 30, 1935; was cut off as Boilermaker and transferred to District 5 as laborer on September 26, 1949; was working as laborer in District 5, South Louisville Shops on March 27, 1950, when recalled and transferred to Shop 3, District 8 as Boilermaker Helper, remained in Shop 3, District 8 as such helper for more than 30 days. Prior to his transfer to Shop 3, District 8 on March 27, 1950, he had laborer seniority in District 5 from October 30, 1935, and Boilermaker Helper seniority South Louisville from October 6, 1936. When he remained as Boilermaker Helper, Shop 3, District 8, more than 30 days from March 27, 1950, he was dropped from laborers' seniority roster for District 5 and thus lost his laborer's seniority in District 5. His claim is that he should have laborer's seniority South Louisville Shops from October 30, 1935.

(d) J. M. Beam commenced working as laborer South Louisville Shops on November 7, 1923; was promoted to Boilermaker Helper on February 26, 1924; by letter dated December 17, 1943, he requested and established laborer's seniority from November 7, 1923 in District 1, South Louisville Shops; was cut off as Boilermaker Helper, Shop 3, and transferred to District 1 as laborer on September 27, 1949; was working as laborer in Shop 1, District 1, South Louisville Shops on November 28, 1949, when recalled and transferred to Shop 3, District 8, as Boilermaker Helper and remained in Shop 3, District 8, as such helper, for more than 30 days. Prior to his transfer to Shop 3, District 8, on November 28, 1949, he had laborer's seniority in District 1 from November 7, 1923, and Boilermaker Helper seniority South Louisville from February 26, 1924. When he remained as Boilermaker Helper, Shop 3, District 8, more than 30 days from his transfer there on November 28, 1949, he was dropped from laborers' seniority roster for District 1 and thus lost his laborer's seniority in District 1. His claim is that he should have laborer's seniority South Louisville Shops from November 7, 1923.

(e) George W. Cowden commenced working as laborer at Etowah, Tennessee on August 5, 1922; was promoted to Machinist Helper at Etowah, Tennessee on June 19, 1923; transferred to Shop No. 1, South Louisville, on October 5, 1936 as Machinist Helper; was cut off as Machinist Helper Shop 1, South Louisville, and transferred to Etowah, Tennessee as laborer on June 16, 1949; was working as laborer at Etowah, Tennessee on July 22, 1949, when recalled and transferred to Shop 1, South Louisville, as Machinist Helper and remained at South Louisville as such helper for more than 30 days. Prior to his transfer to South Louisville on July 22, 1949, he had laborer's seniority at Etowah, Tennessee from August 5, 1922, and seniority as Machinist Helper, Shop 1, South Louisville, from October 5, 1936. When he remained as Machinist Helper, Shop 1, South Louisville, more than 30 days after his transfer on

July 22, 1949, he was dropped from the laborers' seniority roster at Etowah and thus lost his laborer's seniority at Etowah. His claim is that he should have retained his laborer's seniority at Etowah, Tennessee, from August 5, 1922.

(f) Phillip Herd commenced working as laborer, Hazard, Ky., on August 14, 1926; was promoted to Machinist Helper at Hazard, Ky. on November 24, 1926; transferred to Shop 1, South Louisville Shops, as Machinist Helper on October 5, 1936; was cut off as Machinist Helper, South Louisville, and transferred to Hazard as laborer on June 16, 1949; was working as laborer at Hazard on July 26, 1949, when recalled and transferred to Shop 1, South Louisville, as Machinist Helper, and remained there as such helper for 30 days. Prior to his transfer to South Louisville on July 26, 1949, he had laborer's seniority at Hazard from August 14, 1926 and seniority as Machinist Helper, Shop 1, South Louisville from October 5, 1936. When he remained at South Louisville as Machinist Helper more than 30 days after his transfer on July 26, 1949, he was dropped from the laborers' seniority roster at Hazard and thus lost his laborer's seniority at Hazard. His claim is that he should have retained his laborer's seniority at Hazard, Kentucky, from August 14, 1926.

(g) J. S. Cooper commenced working as laborer at Etowah, Tennessee on January 8, 1923; was promoted to Machinist Helper at Etowah, Tennessee, on December 5, 1925, transferred to Shop 1, South Louisville, as Machinist Helper on October 5, 1936; was cut off as Machinist Helper, Shop 1, South Louisville, and transferred to Etowah, as laborer on June 16, 1949; was working as laborer at Etowah, Tennessee on July 22, 1949, when recalled and transferred to Shop 1, South Louisville as Machinist Helper, and remained there as such helper for more than 30 days. Prior to his transfer to South Louisville on July 22, 1949, he had laborer's seniority at Etowah from January 8,

1923, and seniority as Machinist Helper, Shop 1, South Louisville, from October 5, 1936. When he remained as Machinist Helper Shop 1, South Louisville, more than 30 days after his transfer on July 22, 1949, he dropped from the laborers' seniority roster at Etowah, and thus lost his laborer's seniority at Etowah. His claim is that he should have retained his laborer's seniority at Etowah, Tennessee, from January 8, 1923.

(h) George Haddix commenced working as laborer at Hazard, Ky., on November 2, 1926; was promoted to Machinist Helper at Hazard on December 10, 1927; transferred to Shop 1, South Louisville Shops as Machinist Helper on October 5, 1936; was cut off as Machinist Helper, Shop 1, South Louisville, and transferred to Hazard as laborer on June 16, 1949; was working as laborer at Hazard, Ky., on July 22, 1949, when recalled and transferred to Shop 1, South Louisville, as Machinist Helper and remained there as such helper for more than 30 days. Prior to transfer to Shop 1, South Louisville Shops, on July 22, 1949, he had laborer's seniority at Hazard from November 2, 1926, and seniority as Machinist Helper, Shop 1, South Louisville Shops from October 5, 1936. When he remained at Shop 1, South Louisville, more than 30 days after transfer on July 22, 1949, he was dropped from the laborers' seniority roster at Hazard and thus lost his laborer's seniority at Hazard. His claim is that he should have retained his laborer's seniority at Hazard, from November 2, 1926.

(i) Grant McGeorge commenced working as laborer at Loyall on February 7, 1926; was promoted to Machinist Helper, Loyall, on February 1, 1927; transferred to Shop 1, South Louisville Shops, September 18, 1939; cut off at South Louisville by force reduction and transferred to Loyall as laborer on September 26, 1949; was recalled and transferred to Shop 1, South Louisville, November 24, 1949, as Machinist Helper and remained there as Machinist

Helper for more than 30 days. Prior to transfer to Shop 1, South Louisville, on November 24, 1949, he had laborer's seniority at Loyall from February 7, 1926 and seniority as Machinist Helper, Shop 1, South Louisville from September 18, 1939. When he remained at Shop 1, South Louisville more than 30 days after transfer on November 24, 1949, he was dropped from laborers' seniority roster at Loyall and thus lost his laborer's seniority at Loyall. His claim is that he should retain his laborer's seniority at Loyall from February 7, 1926.

(j) A. H. Reynolds commenced working as laborer Shop 14, South Louisville Shops, September 4, 1935; was promoted to Boilermaker Helper, Shop 3, South Louisville, on September 24, 1935; by letter of January 19, 1944, he requested and established his laborer's seniority in District No. 1, South Louisville, from September 4, 1935; was cut off as Boilermaker Helper, Shop 3, and transferred to Shop 1, District 1, as laborer September 26, 1949; was recalled and transferred to Shop 3, District 8, November 28, 1949, as Boilermaker Helper and remained there as Boilermaker Helper more than 30 days. Prior to transfer to Shop 3, District 8, on November 28, 1949, he had laborer's seniority in District No. 1, South Louisville, from September 4, 1935, and Boilermaker Helper seniority Shop 3, District 8, from September 24, 1935. When he remained as Boilermaker Helper in District 8 for more than 30 days after transfer on November 28, 1949, he was dropped from laborers' seniority roster for District 1, and thus lost his seniority as laborer in District 1. His claim is that he should have laborer's seniority, South Louisville Shops, from September 4, 1935.

(k) Lee Standafer commenced working as laborer at Hazard, Ky., October 29, 1924; was promoted to Machinist Helper at Hazard on January 3, 1926; transferred to Shop 1, South Louisville, and commenced working on regular assignment as Machinist Helper Shop 1, South Louisville on September 11, 1939; was cut off as Machinist Helper, Shop 1, South Louisville, and transferred to Hazard as laborer on June 16, 1949; recalled and transferred to Shop 1, South Louisville as Machinist Helper on July 22, 1949, and remained there as such helper for more than 30 days. Prior to transfer to Shop 1, South Louisville as Machinist Helper on July 22, 1949, he had laborer's seniority at Hazard from October 29, 1924, and Machinist Helper seniority, Shop 1, South Louisville from September 11, 1939. When he remained as Machinist Helper, Shop 1, South Louisville, after transfer on July 22, 1949, he was dropped from laborers' seniority roster at Hazard and thus lost his laborer's seniority at Hazard. His claim is that he should retain his laborer's seniority at Hazard, from October 29, 1924.

(1) Robert Demaree commenced working as laborer, South Louisville Shops, March 19, 1923; promoted to Blacksmith Helper, Shop 7, South Louisville, on July 1, 1923; by letter of December 17, 1943, he requested and established laborer's seniority in District 5, South Louisville Shops from March 19, 1923; was cut off as Blacksmith Helper, Shop 7, District 9, and transferred to Shop 14, District 5, as laborer on September 27, 1949; was recalled and transferred to Shop 7, District 9, South Louisville, as Blacksmith Helper on November 14, 1949, and remained there more than 30 days. Prior to transfer to Shop 7, District 9, on November 14, 1949, he had laborer's seniority District 5, South Louisville from March 19, 1923, and Blacksmith Helper's seniority Shop 7, District 9, from June 1, 1923. When he remained as Blacksmith Helper, Shop 7, District 9, for more than 30 days after transfer on November 17, 1949, he was dropped from laborers' seniority roster District 5, and thus lost his laborer's seniority in District 5. His claim is that he should have retained his laborer's seniority in South Louisville Shops, from March 19, 1923.

2. After the twelve plaintiffs were dropped from the laborers' seniority roster, they were not allowed to exercise laborers' seniority in the district from which they were dropped.

3. Dropping these employees from the laborers' seniority rosters and the loss of their laborer's seniority in each instance was in accordance with paragraph 5 of the memorandum agreement of June 1, 1942, between defendant Railroad Company and its employees represented by System Federation No. 91 of the Railway Employees' Department of American Federation of Labor in behalf of International Brotherhood of Fireman, Oilers, Helpers, Roundhouse and Railway Shop Laborers, hereinafter called Firemen and Oilers, which reads as follows—

"5. Anyone retaining seniority under the Foremen and Oilers' Agreement, will lose such seniority and be removed from the roster if he transfers to another point as helper and remains there longer than thirty days. This rule, of course, has nothing to do with his seniority as helper, or mechanic, which is governed by the Shopmen's Skilled Agreement."

Note: In cases where laborers holding common seniority are promoted to helpers at point employed, they will retain their seniority, both as laborers and helpers.

"In cases where a laborer holding departmental seniority is promoted to helper in a sub-department other than the one in which he is employed; he will not retain his seniority as laborer in the department from which he transfers after thirty days.

"In cases where a laborer has been promoted in one department as a helper and is transferred to another department as a helper, he will forfeit his laborer's seniority."

4. Under the agreement in effect prior to June 1, 1942, these twelve employees and all similarly situated would have retained and did retain their laborer's seniority in the district from which they were recalled until the memorandum agreement 1, 1942, became effective.

5. The memorandum agreement of June 1, 1942, did not govern or in any way concern or control the seniority of any of the twelve plaintiffs as helpers or mechanics. Under the agreements which governed their seniority as helpers and mechanics, the said twelve employees and all similarly situated would have forfeited and lost their seniority as Boilermaker Helpers, Machinist Helpers and Blacksmith Helpers, whichever they held, had they not accepted the recall and transferred to helper positions. These agreements were between defendant Railroad Company and International Brotherhood of Boilermakers and International Association of Machinists dated September 1, 1943, and between defendant Railroad Company and United Railroad Workers of America—C.I.O., dated October 20, 1947.

6. Prior to July 24, 1940, none of the defendant Unions represented any employees of defendant Railroad Company.

7. Under the agreements in effect prior to October 1, 1938, the seniority of the laborers employed in defendant Railroad Company's Mechanical Department was "point" seniority and all of the South Louisville Shops constituted a single point for laborers. All of the laborers at the South Louisville Shops were on one seniority roster and could exercise their laborer seniority in any of the shops at that point.

8. By agreement of October 1, 1938, between defendant Railroad Company and the Brotherhood of Maintenance of Way Employees, the then designated collective bargaining representative of the laborers employed by defendant Railroad Company in its Mechanical Department, the South Louisville Shops were divided into 9 separate seniority districts, each of which included one or more separate "shops" and each one of such 9 districts thereafter constituted

a single seniority "point" or district, insofar as the laborers class was concerned, and all persons then working as laborers at said shops were assigned laborer's seniority in the district in which they respectively were then working. William Hillson and A. B. Johnson were working as laborers in Shop 14, District 5 on October 1, 1938, and therefore established laborer's seniority in District 5 from their hire-in dates of August 24, 1925, and October 30, 1935 respectively, and their names so appeared on all seniority rosters issued or posted after October 1, 1938, until their names were dropped from the rosters in 1949 and 1950 respectively.

9. Under agreements in effect prior to October 1, 1938, employees working in higher classes than laborers in any of the South Louisville Shops, when cut off in reduction of forces, were entitled to and did exercise their laborer's seniority, if any, in any of the South Louisville Shops, which then constituted one seniority district. A bulletin in 1938, after execution of the agreement of October 1, 1938, posted by defendant Railroad Company, provided that should there be a future reduction in force the men then working in the higher classes who had laborer's seniority rights at South Louisville Shops would be permitted to exercise such rights into any of the 9 separate districts, and that thereafter each would hold laborer's seniority rights in only the district where he thus placed himself and could not thereafter exercise laborer's seniority in any other district.

10. On December 14, 1943, those employees then working in higher classes who held laborer's seniority and who had not yet had occasion to choose the district in which they desired to establish their laborer's seniority because they had not yet been affected by any reduction in force, were informed by bulletin that they were then required to choose the district in which they desired to establish their laborer's seniority. Plaintiffs J. M. Bean and A. H. Reynolds requested that their laborer's

seniority be and it was established in District No. 1, South Louisville Shops, and plaintiff Robert Demaree requested that his laborer's seniority be and it was established in District No. 5, South Louisville Shops, each dating from the hire-in date at South Louisville Shops and the laborer's seniority dating thus established appeared on the rosters of laborers' seniority for the separate districts posted during the years 1944, 1945, 1946, 1947, 1948 and 1949.

11. The agreement dated June 1, 1942, between defendant Railroad Company and the Firemen and Oilers organization and effective in 1944 and 1949 inclusive provided:

"(a) Seniority rosters of employes will be compiled by seniority districts and will show the employe's dating in each rank to which he is entitled.

"(b) Copies of rosters as soon as compiled, will be posted on bulletin boards at roundhouses, shops and outlying points, and will be furnished to the Local Chairmen and General Chairman. Rosters will be revised in January of each year. They will be open to protest and correction, upon proper proof of error, for a period of sixty days from date posted, which shall be shown thereon. After such period and correction, the dating on the roster shall stand and govern for the period. Any dating which remains unchanged after two years shall not be open to question thereafter."

12. Under the provisions of paragraph 7 of the memorandum agreement of June 1, 1942, Mechanics, that is, Boilermakers, Machinists and Blacksmiths, did not lose their laborer's seniority if recalled from work as laborers in one district to the position of Boilermaker, Machinist or Blacksmith in a district different from the district in which they held laborer's seniority.

13. Any one promoted (as distinguished from the term recalled appear-

ing in finding 12) to Boilermaker, Machinist or Blacksmith position, either directly or through intervening ranks, after the effective date of the memorandum agreement of June 1, 1942, lost his laborer's seniority at the time of such promotion.

14. Prior to August 31, 1949, laborer seniority District No. 7, South Louisville Shops, included the paint shop (Shop No. 15, South Louisville Shop) and the diesel shops (Nos. 17 and 18, South Louisville Shop). On August 31, 1949, by agreement between defendant Railroad Company and the Firemen and Oilers Union, the diesel shops were transferred to laborers' District No. 1, South Louisville Shops, and thereafter laborers' District No. 1 consisted of Shops Nos. 1, 8, 12, 17 and 18, instead of only Nos. 1, 8 and 12, as when the laborers' districts were set up pursuant to the agreement of October 1, 1938. Under the said agreement of August 31, 1949, when additional laborers were needed in the diesel shops (Nos. 17 and 18) they were to be drawn from laborers' District No. 1 instead of laborers' District No. 7, and the defendant Railroad and the defendant Firemen and Oilers' Union agreed to and proceeded to carry out the following arrangement, whereby employees working as laborers in the diesel shops, South Louisville Shops, at the time the shops (Nos. 17 and 18) were transferred, would retain their seniority preference on the diesel shop work that they had been performing as against laborers in District No. 1, whose seniority rights had not previously included such work:

On the 31st day of August 1949, the effective date of said agreement, the names of the following employees who had seniority as laborers in District No. 7 and who were then working in the diesel shops were transferred to an independent seniority roster and after that date said employees were entitled to exercise seniority as laborers in the diesel shops only (and not on any other laborer positions in either District No. 1 or District No. 7), as of the dates shown opposite their respective names:

| | |
|---|---|
| Byron Moore | 5–20–42 |
| Joe H. Carson | 5–25–42 |
| Glenn Smith | 6–30–42 |
| Wilber L. Fykes | 8–11–42 |
| Aaron Simmons | 10–28–42 |
| Olice Hampton | 11–24–42 |
| William Settles | 6– 1–43 |
| | |
| Albert Thompson | 10– 8–43 |
| Neal Swindell | 5–30–43 |
| Arizona Dennison | 10– 5–44 |
| Clarence Adams | 5–29–45 |
| Andrew L. Kindell | 6–23–45 |

15. The employees named in the next preceding paragraph continued to stand for promotion to helper or mechanic in the paint shop, District No. 7, but did not and do not stand for promotion in any of the shops in District No. 1.

16. The following plaintiffs have seniority as laborers in District No. 1, South Louisville Shops:

| | |
|---|---|
| Charlie Bowens | 9–21–45 |
| Tom Langdon | 10– 1–45 |
| Washington Griffith | 10– 8–45 |
| Benjamin Brooks | 12–29–45 |
| Frank A. Porter | 2–25–46 |
| Andrew W. May | 7–23–46 |
| Willard E. Childress | 11–19–46 |
| | |
| Jesse Miller | 11–19–46 |
| Charley L. Hughley | 2– 4–47 |
| Henry E. McReynolds | 2–18–47 |
| Andrew J. Span | 7–14–47 |
| William E. Spalding | 9– 8–47 |
| Lawrence Brown | 9–29–47 |
| | |
| Paul J. Chappell | 11–25–42 |
| Ada L. Price | 10–12–43 |
| Dewey Price | 9–22–41 |
| John Thomas Shobe | 7–10–45 |
| Robert R. Adams | 9–29–39 |
| Frank C. Creal | 9–25–36 |
| Geo. F. Milby | 10– 3–39 |
| Clarence Murphy | 6–27–41 |
| John Rice | 10– 9–35 |
| F. R. Wiser | 9–19–39 |

Although some of said plaintiffs as well as other laborers and parties hereto had and have earlier seniority datings in District No. 1 than some or all of the 25 diesel shop laborers named in Finding 14, neither the said plaintiffs nor any other laborers in District No. 1 or elsewhere have been permitted to roll or displace any of the said 25 diesel shop laborers. It is the claim of these ten plaintiffs that they should be allowed to exercise their laborer seniority in District No. 1 in the diesel shops (Nos. 17 and 18) and when they have earlier laborer's seniority datings than have the employees appearing on the independent roster referred to in finding 14, they should be permitted to roll or displace such employees as have the later seniority datings. Said plaintiffs do have seniority rights in the diesel shops subject only to the priority accorded said 25 laborers transferred from the paint shop.

17. Plaintiffs Sherman Napier, William Hillson and A. B. Johnson are not members of any Union; plaintiff Robert Demaree is a member of The United Railroad Workers of America—C.I.O. and not a member of any of the defendant Unions; plaintiff George Haddix, until 1947, was a member of International Association of Machinists; plaintiffs J. M. Bean and A. H. Reynolds are members of International Brotherhood of Boilermakers, but supported the C.I.O. drive in 1948 or 1949; George W. Cowden, Phillip Herd, J. S. Cooper, Grant McGeorge and Lee Standafer are members of the International Association of Machinists but supported the C.I.O. drive in 1948 or 1949.

18. On June 1, 1942, when the agreement between the defendant Railroad Company and the Firemen and Oilers Union became effective, plaintiffs Sherman Napier, William Hillson, A. B. Johnson, J. M. Bean and A. H. Reynolds were working as Boilermaker Helpers in Shop 3, South Louisville Shops; plaintiffs George W. Cowden, Phillip Herd, Robert R. Adams, J. S. Cooper, George Haddix, Grant Mc-George and Lee Standafer were working as Machinist Helpers in Shop 1, South Louisville Shops, and plaintiff Robert Demaree was working as Blacksmith Helper, Shop 7, South Louisville Shops.

19. No complaint was at any time made by any of the defendants concerning the quality of the work of the plaintiffs or any of the plaintiffs.

20. Under the provisions of the memorandum agreement of June 1, 1942, between the defendant Railroad Company and the Firemen and Oiler's Union when the plaintiffs or any other helpers were cut off as helpers, if they did not make application to exercise their laborer's seniority within four days, they would lose their laborer's seniority and their names would be or have been dropped from the laborer's seniority rosters.

21. Other employees were dropped from the laborers' seniority rosters and lost their laborer's seniority when accepting recalls as did plaintiffs. For instance, at the time the names of Phillip Herd, George Maddix, Sherman Napier and Lee Standafer were dropped from the laborers' seniority roster at Hazard, Kentucky, the names of Elija R. Holliday and Clarence A. Munger were also dropped from said roster for the same reason that the names of the said plaintiffs were dropped.

At the time the name of the plaintiff Robert Demaree was dropped from the laborers' seniority roster for District No. 5, South Louisville Shops, the name of Edward Staples was also dropped from said roster for the same reason that the name of said plaintiff was dropped.

At the time the name of the plaintiff William Hillson was dropped from the laborers' seniority roster for District 5, South Louisville Shops, the names of Richard A. Hobbs and Thomas J. Whitney were also dropped for the same reason.

At the time the names of plaintiffs J. M. Bean and A. H. Reynolds were dropped from the laborers' seniority

roster for District 1, South Louisville Shops, the names of R. B. Christopher, H. F. Crigler, William A. Reichle and Hector Howard were also dropped from said roster for the same reason that the names of said plaintiffs were dropped.

At the time the names of George W. Cowden and J. S. Cooper were dropped from the laborers' seniority roster at Etowah, Tennessee, the name of W. B. Tipton was also dropped for the same reason the names of the said plaintiffs were dropped.

22. The following document, dated February 25, 1950, bearing the names of George Haddix, Sherman Napier and 19 others was received by defendant Railroad Company, and by the General Chairman of the International Brotherhood of Firemen, Oilers, Helpers, Roundhouse and Railway Shop Laborers:

"The Superintendent of Machinery,
The Master Mechanic,
The Director of Personnel of the Louisville & Nashville Railroad Company,
The General Chairman of International Brotherhood of Firemen, Oilers, Helpers, Roundhouse and Railway Shop Laborers.

"We, the undersigned helpers in the Mechanical Department of the South Louisville Shops of the Louisville & Nashville Railroad Company, hereby protest the removal of our names from the Laborers Seniority Rister in the Mechanical Department of said Railroad, dated January 1, 1950, pursuant to Rule 9(6) of the Laborers Agreement dated June 1, 1942, and request the replacement of our names upon said Roster, for the reason that under Rule 7 of the Laborers Memorandum Agreement, dated April 27, 1942, we held seniority prior to June 1, 1942, in classes covered by the Firemen and Oilers' Agreement, and now hold same and that our seniority as Laborers is not, therefore, affected by said Memorandum Agreement.

"This 25th day of February, 1950.

| "Name | Address |
| --- | --- |
| George Haddix, | 506 Winkler Ave. |
| Geo. W. Cowden, | 520 Denmark |
| Lee Standafer, | 100 E. Adair Ave. |
| R. A. Moser, | 839 Reading Rd. |
| Sherman Napier, | R. 3 Box 180 R. Valley Sta. Ky. |
| Jap Fultz, | 330 Atwood |
| Joe Cooper, | 728½ Bastin |
| W. B. Tipton, | 2919 So. 5th St. |
| Jess E. Erwin, | 209 Ottawa |
| Alvin J. Oeth, | 141 E. Ashland Ave. |
| R. B. Christopher, | 1311 S. Brook St. |
| J. M. Bean, | 1638 Berry Blvd. |
| C. A. Munger, | 414 Creel Ave. |
| Mike O'Keefe, | 2108 Dumennil |
| Elijah Holliday, | 707 Creel St. |
| Philip Herd, | 3343 Taylor Blvd. |
| T. G. Whitney, | RR 8, Box 238, Louisville 16, Ky. |
| W. H. Evans, | 119 East Collins Ct. |
| R. Demaree, | 523 East Brandeis |
| J. B. Hoagland, | 935 Lydia |
| A. E. Ryan, | RR 3, Jeffersonville, Ind." |

23. Defendant Railroad Company did not consult with any of the plaintiffs or with any classes of employees represented by them and did not give them

or any of them notice of its intention to enter into either the agreement of June 1, 1942, or the memorandum agreement of June 1, 1942.

The Union defendants did not formally consult or notify in advance of negotiations of either of said agreements.

Plaintiffs and all other employees covered by said agreements have continued to work and to accept the benefits of said agreements since the same became effective without complaint until the document quoted in finding 22 was received by defendants.

24. The Firemen and Oilers Union has never been authorized to act as collective bargaining representative for helpers employed in the mechanical crafts of the defendant Railroad Company.

25. The Firemen and Oilers Union is and has been at all times since July 24, 1940, the duly certified, designated and authorized collective bargaining representative under the Railway Labor Act, 45 U.S.C.A. § 151 et seq. of the laborers employed by defendant Railroad Company in its mechanical department.

Discussion and Conclusions of Law.

From the foregoing facts it appears that 12 of the plaintiffs (Sherman Napier, William D. Hillson, A. B. Johnson, J. M. Bean, George W. Cowden, Phillip Herd, J. S. Cooper, George Haddix, Grant McGeorge, A. H. Reynolds, Lee Standafer and Robert Demaree) were dropped from the seniority roles as laborers under the provisions of the agreement of June 1, 1942, negotiated between the L & N and the Brotherhood of Firemen, Oilers, Helpers, Roundhouse and Railway Shop Laborers.

It further appears that 10 of the plaintiffs, pursuant to the agreement of August 31, 1949, negotiated by the L & N and the same bargaining agency of its employees in the Mechanical Department, were refused when they sought to displace other employees in the diesel shop. But for the change brought about by the agreement of August 31, 1949, with respect to seniority, as it had existed prior to that date, their right to displace the employees whom they sought to displace would have been unquestioned.

The plaintiffs were not given notice of the collective bargaining negotiations from which the questioned provisions resulted nor was any opportunity afforded them to be present during these negotiations to present their arguments or protect rights which they allege had accrued on their behalf through previously existing collective bargaining agreements. At the time of these negotiations, the plaintiffs were not employed by the L & N as laborers, but were working in the classifications of helpers. Until the execution of the contract first in question, the June 1, 1942 agreement, the plaintiffs retained seniority as laborers and could resume their employment in that capacity if laid off as helpers.

After June 1, 1942, the plaintiffs retained their seniority in the laborer classification, but thenceforth subject to the condition that if they thereafter resumed employment as laborers in any district under the agreement, they could not then accept a promotion to the classification of helper in any other district for longer than thirty days without forfeiting their seniority in the laborer classification.

On August 31, 1949, the bargaining agency and the L & N executed the second contract in question, providing that certain employees classified as laborers in Shop No. 15, South Louisville Shop and the diesel shops were transferred to a different laborer's district, but should retain a seniority preference for diesel shop work which they had been performing as against other laborers in the district to which they were so transferred. This agreement, say the plaintiffs, gives a discriminatory and unlawful preference to a special group of employees detrimental to others in the bargaining unit which the bargaining agency is bound to represent fairly and without arbitrary distinction.

Plaintiffs' attack upon the agreements in question is twofold: First, that the provisions are the instruments of a hostile and discriminatory course of conduct by the defendants in violation of a fiduciary obligation imposed by the Railway Labor Act, and defined by the Supreme Court in Steele v. Louisville and Nashville Railroad Company, 1944, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173, and therefore void.

Second, that the said provisions, whatever their actual fairness in effect may be, must be stricken because they concern matters of individual interest and right, outside the scope of the collective interest for which the collective bargaining representative is not authorized to bind the individual employee. The latter argument is set forth and accepted in the Supreme Court decision of Elgin, Joliet & Eastern Railway Co. v. Burley, 1945, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886.

It is true we are here faced with distinctions sometimes difficult to apply to a given set of facts. Judge Murrah of the Court of Appeals defined the dichotomy as follows in Beeler v. Chicago, R. I. & P. Ry Co., 10 Cir., 1948, 169 F.2d 557, 559—

"The Railway Labor Act of 1926 * * * vouchsafes and encourages collective bargaining between the railroads and their employees through designated bargaining representatives. Order of Railway Telegraphers v. Railway Express Agency, 321 U.S. 342, 64 S.Ct. 582, 88 L.Ed. 788; Steele v. L. & N. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173. It, however, specifically recognizes the right of an individual employee to confer with management concerning matters of individual interest, and the bargaining representative is not authorized to bind the individual employees on matters outside the scope of the collective interest. Elgin J. & E. R. Co. v. Burley, 325 U.S. 711, 65 S.Ct. 1282 * * *. See also Lewellyn v. Fleming, 10 Cir., 154

F.2d 211. The statute does not draw the line or prescribe the boundaries between the collective interest in which the bargaining representative is authorized to act for the employee and the individual interest in which the employee is entitled to individual representation with notice and opportunity for hearing. Nor have the courts found a ready formula for delimiting such authority. Elgin J. & E. Ry. Co. v. Burley, supra."

■■ We cannot find merit in the plaintiffs' first contention. While it is true that the collective bargaining representative acts in the areas of collective interests as a fiduciary and must abstain from arbitrary, capricious or hostile discriminations, it does not follow that no collective bargaining agreement may have an unfavorable effect on some members of the craft represented without, per se, demonstrating a breach of the fiduciary duty imposed by law. The recent case of Pellicer v. Brotherhood of Ry. & S. S. Clerks, Freight Handlers, Express and Station Employees, D.C., 1953, 118 F.Supp. 254, is directly in point. There, the plaintiff was employed under collective bargaining agreements, as a clerk, freight handler and station employee in a department or seniority division of white men similarly employed, from the time of his first employment in 1929 until 1952. During this same period, the collective bargaining agreements under which the plaintiff was employed provided for a department or seniority division of colored clerks, freight handlers and station employees whose seniority, also, was effective only within their department. By the 1952 agreement, which the plaintiff challenged, the two departments were merged and seniority of all was made extensive with the new, larger department so produced. This resulted in the plaintiff being placed in a less desirable position on the seniority roster and more in jeopardy of lay-off in the event there was a reduction in force. Factually,

the only distinction between this case and the Pellicer case, supra, lies in the nature of the variations of department or seniority division made. Here it was to narrow the size of the department in which seniority was to operate, there, it was to expand the seniority division. In either case, some employee must lose a seniority preference. Judge Simpson succinctly set forth the legal basis and reasoning behind his decision in the Pellicer case, supra, at 118 F.Supp. 254, 257, 258, as follows—

"The substance of plaintiff's claim is that any amendment or modification in the provisions of a collective bargaining agreement must operate equally as to all members of the craft without discrimination, and that all must be treated in an identical manner. This was confirmed at the time of oral argument. No fraud or bad faith is claimed.

"In support of this position plaintiff relies on the holding of the Supreme Court in Steele v. Louisville & Nashville Railway Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 and other similar decisions involving racial discrimination. See Tunstall v. Brotherhood of L. F. & E., 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187; Brotherhood of Railroad Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283; Brotherhood of Locomotive Firemen & Enginemen v. Mitchell, 5 Cir., 190 F.2d 308; Rolax v. Atlantic Coast Line Railroad Co., 4 Cir., 186 F.2d 473. But as I read these decisions they do not stand for the proposition for which plaintiff contends. In the Steele case the complaint disclosed a change in an agreement based solely on race, the effect of which would have eliminated Negro firemen from service. The Court held that discriminations based on race alone were 'obviously irrelevant and invidious', and constituted a violation of the obligation of a bargaining representative under the Railway Labor Act to represent all employees of the craft fairly and without hostile discrimination because of race. But the Court also stated, 323 U.S. 192, 203, 65 S.Ct. 232:

"'This does not mean that the statutory representative of a craft is barred from making contracts which may have unfavorable effects on some of the members of the craft represented. Variations in the terms of the contract based on differences relevant to the authorized purposes of the contract in conditions to which they are to be applied, such as differences in seniority, the type of work performed, the competence and skill with which it is performed, are within the scope of the bargaining representation of a craft, all of whose members are not identical in their interest or merit.'

Here, except for the claim amounting to no more than a conclusion of law that the amended agreement was arbitrarily entered into and is arbitrary and discriminatory in its terms and effects, there are no factual allegations in the complaint that the Express Company and the Brotherhood did not in good faith negotiate and make the seniority changes effectuated by the amended agreement. It would indeed 'turn the blade inward' were this Court to hold invalid and unlawful that which appears on the face of the complaint and attached exhibits to be a good faith effort on the part of the Brotherhood and Express Company to comply with pronouncements of the Supreme Court in the racial discrimination cases.

"It is significant that in cases where challenged changes in seniority provisions did not involve racial discrimination, the courts consistently have refused to upset the agreement. Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048; System Federation No. 59 of Railway Employees' Depart-

ment of American Federation of Labor v. Louisiana & A. Ry. Co., 5 Cir., 119 F.2d 509, certiorari denied 314 U.S. 656, 62 S.Ct. 108, 86 L.Ed. 526; Hartley v. Brotherhood of Railway & Steamship Clerks, 283 Mich. 201, 277 N.W. 885; Elder v. New York Central Ry. Co., 6 Cir., 152 F.2d 361 * * *. These cases establish that seniority rights stem either from a statute or are created by contract; that contractual provisions of bargaining agreements establishing such rights do not create a permanent status or give an indefinite tenure, but are subject to modification by the contracting parties; that changes effecting differentiations or unequal treatment among employees will not be invalidated unless some clearly expressed public policy is contravened; and that in the absence of fraud or bad faith the courts will not inquire into the motives which prompt such changes or substitute their judgment on the reasonableness of the modifications effected.

"The latest authoritative expression to this effect is that of the Supreme Court in Ford Motor Co. v. Huffman, supra, decided on April 6, 1953. There the Court reversed a decision of the United States Court of Appeals for the Sixth Circuit which had held the mere fact of discrimination as among employees sufficient to invalidate changes in seniority provisions. Huffman v. Ford Motor Co., 6 Cir., 195 F.2d 170, 174. In rejecting this view, the Supreme Court said, 345 U.S. 338, 73 S.Ct. 686, 97 L.Ed. 1048:

" 'Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.

" 'Compromises on a temporary basis, with a view to long range advantages, are natural incidents of negotiation. Differences in wages, hours and conditions of employment reflect countless variables. Seniority rules governing promotions, transfers, layoffs and similar matters may, in the first instance, revolve around length of competent service. Variations acceptable in the discretion of bargaining representatives, however, may well include differences based upon such matters as the unit within which seniority is to be computed, the privileges to which it shall relate, the nature of the work, the time at which it is done, the fitness, ability or age of the employees, their family responsibilities, injuries received in course of service, and time or labor devoted to related public service, whether civil or military, voluntary or involuntary. See, e. g., Hartley v. Brotherhood of (R. & S. S.) Clerks, 283 Mich. 201, 277 N.W. 885; and see also, Williamson & Harris, Trends in Collective Bargaining (1945) 100–103.'

"In the light of these observations, plaintiff's claim that all members of the craft must be treated equally and without discrimination must be rejected as contrary to established law."

No merit is found in the plaintiffs' second contention. The individual employee rights, which the Supreme Court placed beyond the power of the collective bargaining representative in the Elgin case, supra, were held not to include seniority preferences achieved under prior agreements. In the case of Lewellyn v. Fleming, 10 Cir., 1946, 154 F.2d 211, the plaintiff was employed by the C. R. I. & P. Railroad Company under an individual employment agreement which accorded him greater seniority

than men employed in the other districts of the railroad's operation. However, in February 1938, the defendant railroad executed a collective bargaining agreement with the Order of Railway Conductors under the Railway Labor Act, covering the craft of railway conductors to which plaintiff belonged. This agreement equalized plaintiff's seniority with that of all other conductors employed at other districts of the railroad's operations. He sued, contending that his seniority rights acquired under his employment contract were vested, valuable property rights which the Railway Labor Act does not authorize collective bargaining representatives to abrogate and that his employer could not constitutionally deny him these rights under the Fifth Amendment. The Court said, at 154 F.2d 212, 214:

"Congress was undoubtedly free to enact the Railway Labor Act in the exercise of its commerce powers, and the policy expressed therein cannot be thwarted or hindered by contracts between private parties. * * * Private contracts relating to matters affecting interstate commerce are necessarily made in contemplation of transcendent Congressional power to regulate all matters and activities in commerce or affecting commerce. And such contracts, when validly made, can be enforced only in a manner not to conflict with the expressed Congressional policy * * * but private contracts which relate to collective bargaining rights between the railroad and employee 'may (not) be used to forestall bargaining or to limit or condition the terms of the collective agreement.' * * * In our case, the collective agreement was prospective in its effect."

In Austin v. Southern Pacific Railroad Company, 1943, 50 Cal.App.2d 292, 123 P.2d 39, plaintiff, a dining car chef, was demoted to second cook from first cook in June 1933, after working as first cook from the time of his first employment in 1911. He sought restoration of his seniority and, inter alia, alleged that the defendant carrier and a labor organization representing the bargaining unit to which he belonged had entered into a collective bargaining agreement, "secretly", "deliberately", and "without notifying" him, which deprived him of his prior seniority preferences.

The Court failed to find any basis in the record for upholding the plaintiff's claim that he had any seniority rights prior to the agreement in question, but added, 123 P.2d at page 42:

"Under the act, if * * * respondent union had been elected as * * * (bargaining agent) by a majority of dining car personnel even despite appellant's adverse vote—he would not necessarily know of, or be entitled to notice of, the negotiation of the contract itself."

In Walker v. Pennsylvania-Reading Seashore Lines, 1948, 142 N.J.Eq. 588, 61 A.2d 453, the plaintiffs attacked a change in seniority rosters involved in a merger of two separate railroad companies as well as the negotiations giving rise to such changes, on the ground that they were arbitrary (overruled by the Court) and on the ground that one of the local labor organizations involved had not received statutory notice of the proposed negotiations under Section 156 of the Railway Labor Act, Title 45 U.S.C.A. § 151 et seq., (also overruled by the Court). The Court made the following statement quoted from 61 A.2d 466:

"It is quite apparent that sections 152–156, having in mind the general purposes of the Act, contemplated the amicable settling of disputes between the employer and the bargaining agent. The provision therein contained for notice and conference and intervention of the Mediation Board demonstrates clearly the anticipation of a possible dispute between the employer and the employee. It is the expressed desire and stated public policy of the statute to peacefully settle such disputes to avoid 'any interruption to com-

'merce.' The general purposes of the Act are attained and do result if an original agreement of employment or a modification of an existing agreement are amicably arrived at by the parties thereto. If such situation arises there is, of course, no excuse or reason for a notice or conference. *The notice required under the statute is to be given to the representative of the employees and not to the employees themselves* and no needful purpose could be served to require such notice where there was no controversy between employer and employee. Under the circumstances here present, those provisions may be expressly waived by the parties. The complainants, therefore, cannot be heard to complain that no such notice was given to their legally constituted representative, who patently waived the same. It would, in such circumstances, be needless and ridiculous to require notice to the bargaining agent where there was a peaceful conclusion of negotiation, without any dispute as is contemplated by the statute." (Emphasis added.)

 These cases reject the contention that Section 6 of the Railway Labor Act, 45 U.S.C.A. § 156, requires that before a carrier and the statutory representative of a craft or class of its employees may mutually agree upon a change in an existing collective bargaining agreement between them, they must give notice and an opportunity to be heard to the individual employee in the craft or class who would be affected by the change.

 However, the plaintiffs urge that the Kentucky law which governs the contracts in question treats a seniority right under an existing agreement as a vested property right which cannot be altered or reduced by subsequent collective bargaining contracts and cite for their authority the case of Piercy v. Louisville & N. R. Co., 1923, 198 Ky. 477, 248 S.W. 1042, 33 A.L.R. 322. We do not so understand the law. The Kentucky

Court of Appeals in the later decision of Day v. Louisville & Nashville Railroad Co., 1943, 295 Ky. 679, 175 S.W.2d 347, denied a plaintiff the right to enforce against his employer seniority rights accruing under a collective bargaining agreement where his duly authorized collective representative negotiated a contract providing for less seniority for the plaintiff, in effect cutting off previous preferences he had enjoyed. In doing so, the Court of Appeals of Kentucky adopted the Massachusetts rule of Donovan v. Travers, 1934, 285 Mass. 167, 188 N.E. 705, stating at 295 Ky. 683-684, 175 S.W.2d 349:

"If the brotherhood has authority to enter into a binding contract in respect to divisional operation of trains in the first instance, it has the right to amend the contract, even if such a change necessitates the placing of a conductor under the operation of a different division, provided such conductor is accorded the seniority rights to which he becomes entitled in the division in which he is placed."

The Michigan rule was also cited with approval in the Day case, supra, as represented by the case of Ryan v. New York Central R. Co., 1934, 267 Mich. 202, 255 N.W. 365, where a contract entered into in 1914 by a railroad and a union created interchangeable rights as between passenger and freight trainmen, and under it freight trainmen might earn seniority rights if employed in the passenger service and passenger brakemen if employed in the freight service, and the rule was changed by the railroad in 1917 to read that baggagemen and brakemen on the western and middle divisions should be given rights on all through passenger runs between Detroit and Chicago as baggagemen and brakemen respectively, the court stated that the plaintiff, a freight brakeman, who had been the employee of the railroad and its predecessor since 1912, had no inherent right to seniority in service, and that such a right did not arise out of his

employment by the railroad company except as provided for in the contract entered into and the rules adopted by the company relating thereto.

The Piercy case, supra, relied upon by the plaintiffs, was clearly distinguished by the Kentucky Court of Appeals in the Day case, supra, on the basis of the facts in issue. In the Piercy case, supra, it was pointed out that the plaintiff sought to enforce an existing collective bargaining agreement granting him seniority preferences against an effort of the defendant carrier and his collective bargaining representative to subvert its terms so as to discriminate against the plaintiff in its application. Thus the Piercy case, supra, is no authority for denying the employer and the collective bargaining representative the right to modify seniority preferences of employees by undiscriminatory changes in the agreement as previously written.

The plaintiffs insist that regardless of the effect the questioned contract provisions might have upon men who were employed as laborers at the time of their execution, the absence of special notice and an opportunity to be heard defeats such provisions as to those who were employed as helpers, since the A. F. of L. was empowered by the Railway Labor Act to bind only laborers through collective bargaining negotiations. Carried to its logical conclusion such a contention, if upheld would becloud collective bargaining with an invitation to the use of evasive tactics rather than clarity and purpose and would place the courts in constant attendance at the bargaining table. It is difficult to perceive what rights the plaintiffs claim if not under the agreements in question. The June 1, 1942, agreement between the A. F. of L. and the L. & N. Railroad Company provides, at page 21 thereof:

"This agreement shall take effect as of June 1, 1942, superseding all former rules and agreements and shall remain in effect, subject to thirty days' written notice by either party to the other. Such notice shall show the proposed changes and the handling shall be in accordance with the Railway Labor Act, amended June 21, 1934."

Thus, any agreements previous to the ones in question have been superseded. Without such an agreement the plaintiffs have naught but an at-will contract of employment with the defendant carrier. In the Beeler case, supra, the court stated this proposition in denying relief to an individual plaintiff held not to be covered by the collective bargaining agreement in question, quoting at 169 F.2d 559:

"If appellant's employment comes within the bargaining contract invoked, no one questions his right to maintain an action for damages for the breach thereof. * * * Conversely, apart from his automobile expense, he has no right of action outside the contract. His employment is terminable at will, and his discharge without a hearing is not an actionable wrong."

That the plaintiffs must either stand together with all other employees covered and affected by the A. F. of L. agreements regarding laborer classifications, or fail entirely to prove any right to relief is clearly demonstrated in the case of Coxon v. Southern Pacific Company, 1946, 155 F.2d 455, 456, where Judge Stephens said:

"Items of alleged damage appear to be based upon rights claimed under or because of the company-labor organization agreement, and at the same time appellant affirmatively alleges in the complaint that he is not a member of the labor organization and that the agreement entered between the company and the labor organization does not apply to or affect him or his rights. Appellant also claims that his discharge damages him in the matter of company policy as to employee seniority and other employee benefits. However, no agreement of employment other than employment at the will of the employer is alleged. It follows that

appellant was subject to discharge at any time."

Finally, the plaintiffs' attack upon the provisions in question fails to demonstrate that the seniority preferences they enjoyed under collective bargaining agreements prior to the ones in question have been taken from them by the later agreements. If the plaintiffs are unemployed at this time, the record shows that the seniority they now claim as laborers was not taken from them by the contracts in question, but actually was abandoned through their voluntary act. The plaintiffs were given by the contract thirty days after their offered transfer to helper positions in other districts before they lost their laborer seniority and the choice was theirs to be made.

The second agreement, of August 31, 1949, on its face took no seniority preferences from any one. The laborers from the diesel shops were permitted to keep a preference they already enjoyed and would have lost through the transfers provided for in the questioned agreement.

The Circuit Court of the Sixth Circuit, speaking through Judge Miller in the case of Brown v. Watt Car and Wheel Company, 182 F.2d 570, 572, defined seniority as the

" * * * relative position among all employees within a specified job group, determined by length of service with the employer, conferring upon those having such seniority certain *priorities with respect to jobs,* promotions, lay-offs and other such matters *as provided by the contract between the employer and the Union.* But such *rights on the part of the employee come from the union contract not from seniority.*" (Emphasis added.)

 Seniority being primarily a matter of contract, a duly constituted bargaining agent is authorized to negotiate with the employer concerning seniority. In the absence of racial discrimination, no case has been cited by Counsel or found by the Court where a court has upset an agreement because of challenged changes in seniority provisions. Pellicer v. Brotherhood of Railway S. S. Clerks, etc., supra, Huffman v. Ford Motor Company, 345 U.S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048.

The contract in this case appears neither discriminatory nor in violation of law or public policy. It follows that the complaint herein should be dismissed.

A judgment so disposing of the case may be tendered by defendants' Counsel upon notice.